ANNIE McKIMBLE, administratrix, *vs.* BOSTON AND MAINE RAILROAD.

Suffolk. Jan. 20. — June 24, 1885. FIELD, DEVENS, & COLBURN, JJ., absent.

In order to maintain an action against a railroad corporation for causing the death of the plaintiff's intestate, while a passenger, by its negligence or the gross negligence of its servants or agents, it is not necessary for the plaintiff to show that his intestate was not negligent.

If a passenger on a railroad car, who has in his possession a ticket good from one station to another on that road, leaves the car at an intermediate station, not having had an opportunity to surrender his ticket or pay his fare, it cannot be assumed, as matter of law, in an action against the railroad corporation for negligently causing his death, that he was not riding upon the ticket which he held, or that he intended to evade the payment of his fare, or left the car for that purpose.

A passenger on a railroad car continues to be such while rightfully leaving the car and the station at which it has stopped.

If a railroad corporation has made provision for passengers to leave its cars upon one side only of the track at a station, and it is dangerous to leave upon the other side, in an action against the corporation for negligently causing the death of a passenger, while leaving a car upon the wrong side, it is a question for the jury whether it was negligent in the corporation not to have provided some means to prevent passengers from leaving on that side, or to notify them not to do so.

TORT, by the administratrix of the estate of Jeremiah Mc-Kimble, for causing his death. The declaration contained two counts. The first count alleged that the intestate was a passenger on the defendant's train, and was killed while leaving the

same on January 10, 1883, at Charlestown, when the train stopped, through the defendant's negligence and the gross negligence of its servants. The second count alleged that, at the time the intestate was killed, he was not a passenger, nor in the defendant's employment; that he was in the exercise of due care, and was killed through the negligence of the defendant and the gross negligence of its servants. Answer, a general denial.

Trial in the Superior Court, before *Gardner*, J., who reported the case for the determination of this court, in substance as follows:

There was evidence tending to show the following facts: The plaintiff was appointed, on January 23, 1883, administratrix of the estate of Jeremiah McKimble. The intestate took a train from Boston on the defendant's railroad, on January 10, 1883, and was killed after leaving the train at Prison Point, sometimes called Charlestown, on the left-hand side, and while in the act of crossing the inward track to get off the defendant's premises, by a freight car which was moving towards Boston, pushed by a shifting engine. The time of the accident was between daylight and dark, dark enough for lamp-lighting; and at the time it was snowing and blowing hard.

The railroad, after leaving Boston in a northerly direction, and crossing Charles River, crosses Miller's River obliquely by a drawbridge, then Austin Street, which leads from Charlestown to Cambridge, this crossing being nearly at right angles and about a mile from the station at Boston, and then the Fitchburg Railroad by a grade crossing. The main line of the defendant's railroad consists of two parallel tracks, of which outward trains use the easterly and inward trains the westerly. On the westerly side of the main track of the railroad lies a triangular space, bounded by Miller's River, Austin Street, and the main tracks of the road. This area, formerly flats, on the border of Miller's River, is occupied as a freight yard of the defendant, and is filled land. The main tracks which run by the area rest partly upon a wooden structure built on piles over the water, and partly upon filled land. The filling under the main track extends northerly, from a point where a sign marked " 500 feet " is erected, to the Fitchburg Railroad crossing and beyond. This

area, a freight yard of the defendant, through which the freight engines, cars, and shifters continually run, is covered with side tracks, except a large triangular space, partly paved, in front of a freight-house, used as a milk yard, and entered from Austin Street. This milk yard is separated from the main tracks of the defendant by a side track. A person leaving the outward and easterly track of the main line, by crossing the inward main track and the side track just referred to, could reach a portion of the triangular space last referred to, and from that the milk yard and Austin Street, without crossing any other track of the defendant.

So much of the main tracks as extended over the water for part of the distance, and at the place where the injury occurred, were laid upon ordinary sleepers placed ten inches or more apart. These sleepers rested upon the stringers of the pile structure, and between the sleepers there were open spaces, extending down to the water, large enough for small men to fall through. The structure was not close nor compact. There was no platform on the westerly side of the railroad south of the Fitchburg Railroad crossing, and no provision whatever for passengers on that side, unless the preceding description indicates such provision.

Since the accident, the road-bed has been changed by the substitution throughout of squared timbers for sleepers, and whatever boards or planks lay between the rails have been removed.

On the easterly side of the easterly track was a platform extending from the Miller's River draw to Austin Street, rather longer than an ordinary passenger train.

Over the platform, about opposite the place of the accident, a light was hung in the night by a switchman. At this place, on the platform, is a sign marked "500 feet," indicating a distance of five hundred feet from the Fitchburg Railroad crossing, and another sign, extending out over the platform, which reads, " Trains from Boston stop here." This platform is about six hundred and sixty feet long, and extends from the Miller's River draw to Austin Street. There was another sign somewhere on the premises, which read, " Take the cars from Boston down the platform."

The Fitchburg Railroad crossed the defendant's railroad a few feet above Austin Street, which street is about ninety feet wide; and the distance from the end of the platform to the middle of the crossing of the two railroads is about one hundred and thirty feet. The platform here extends around a building which stands between the tracks of the two railroads, and which contains two rooms, one on the Fitchburg Railroad side, used as a waiting-room, and one on the defendant's side, past which the platform runs, used by the defendant, and called by some of the witnesses a waiting-room. The two rooms are separate and distinct. The defendant's room contained at the time a stove, and a dozen of chairs screwed to the floor around the room. It was hardly large enough for a hundred people to stand in. In one corner a cobbler, named James Parks, had his bench, kept a small variety shop, and sold cigars, candy, medicines, blackings, &c. He shovelled snow, swept and sprinkled around the building at night, and worked at his bench; and, if any passenger wanted to know about a train, he told him the proper train to take. One witness testified, that he had marked bundles for him, and that he sold no tickets. There were time-tables of the defendant's trains hung up in the room, and a notice, painted on thick paper, framed and hung up, which read, " No tickets sold here, and no extra charge on the train."

Daniel Breslin, called as a witness by the plaintiff, testified, that he had been in the employ of the defendant since February, 1872; that a part of his duties was taking care of what is termed a station at Prison Point; and that Parks died in July, 1883. On cross-examination, he testified, that he was in the employ of the defendant in January, 1883; that his duties had nothing to do with the room above mentioned except to write reports; that he had a little desk on which he wrote reports; that his duties were connected with the freight and freight cars out on that ground; that they were so in January, 1883; and that all the charge that was had of that room by anybody was not in him, but in Parks.

Persons were accustomed to inquire of Parks about tickets, and, to obviate questions, he got the master mechanic of the defendant to paint a notice, " No tickets sold here, and no extra charge in the cars," and Parks there posted it up. People got

on and off the defendant's train at Charlestown, and occasionally on the left-hand side of the train.

For many years the defendant had stopped all its trains at Prison Point, at a point within five hundred feet of the crossing of the Fitchburg Railroad. In 1855, a statute was enacted, and has since been in force, requiring such a stop. The sign marked "500 feet," above referred to, is at a distance of five hundred feet from the Fitchburg crossing.

When stopped within said distance, long trains sometimes extended towards Boston beyond the end of this platform on the easterly side of the tracks referred to, and beyond the Miller's River draw, and one or two cars stood upon the draw over Miller's River and beyond towards Boston.

There was no suitable provision whatever for passengers to alight on the draw, or to cross it, and whoever alighted from that part of the train which stood on the draw would fall into the water.

The defendant's repair-shops and engine-houses stood on the grounds south of the draw, and many of the employees at its shops took and left the trains at Prison Point, and crossed the draw.

There was no evidence of any preparation to receive passengers on the westerly side of the train, unless it appears from what is stated in this report.

The freight car ran over the intestate, and cut off his head, after the train which he left had stopped, and before it had started again. The train had stopped before he got off. His dead body was found lying upon the wooden structure or trestle-work over the water. The conductor had not come into the car in collecting his fares; and there was found on the intestate's body, soon after the accident, by the policeman called to take charge of it, a five-trip commutation ticket over the defendant's road from Boston to Malden, which was marked, "Not good to stop over on," and which had not been punched.

John H. Eaton testified, that he sat in the same car with the intestate, who sat on the front seat in the left-hand corner of the car, two to four seats from him; that he saw him get off at Charlestown, saw two men inside of the door as the intestate went to the front end of the car, and heard him cautioned once

or twice not to get off till the train stopped; that the conductor had not come along, and no one had asked him for his fare; that the train stopped just as the intestate got to the door; that he saw him last just as he turned to the left to get off the car; and that, after the intestate disappeared, he heard a cry, "Oh!" once on the other track; and further testified as follows: "While we were at the station, or leaving it, saw a freight car come down with an engine pushing it on the other track. It was a minute or less from the time I saw the man go out the door before I heard the cry, 'Oh!' There are six feet between the tracks, and a passenger or freight car projects two feet five inches on either side. I told Mr. Knight, one of the defendant's agents, that the train had stopped when he got. to the door. When I heard the cry, I looked out of the window and saw the freight car coming along; I think I was on the fifth car; I sat next the aisle, and had to reach over Mr. Linton, who sat next the window in the same seat. By the time I got there, I saw the freight car."

Rogers Linton testified: "I sat on the same seat with Eaton, on the left-hand side of the train, next the window. I saw a man on the front seat talking with another who sat on the same seat with him; heard their voices, but did not pay attention to their conversation; saw one of them get up to go out at Charlestown. There were two men in the passageway in front of him. I should think the train had stopped just as he was going out the door. I saw a freight car go by on the other track. It was between daylight and dark, middling dark, dark enough to light lamps, and was snowing quite hard and blowing. I heard a cry, 'Oh!' before the freight car came in my sight, and before my train had started again; I did not notice whether there was an engine or not, or whether any head-light was lit."

Charles Manning testified: "I got on the same train at Charlestown; I thought the train had fully stopped when I got on. When I had got on, I saw a man lying on the opposite track at a little angle from where I was; he had his right foot over one of the sleepers, and afterwards he drew that foot up. I did not see him struck, because our train started and brought the wheel of the freight car between the man and myself. I was on the rear platform of a passenger car and saw him at an

angle. He lay on the track six or eight feet more or less below where I stood; a little below, but not more than six feet beyond, the platform of the front end of the next car, which was the car which McKimble had left. I looked to see him diagonally from the platform where I stood. Parker and Haseltine got on with me besides. There was no indication, when I saw it, that the freight train passed over him before my train started. Since the accident, the old sleepers have been taken up and squared timbers put down. The accident happened about five hundred feet from the Fitchburg crossing. The conductors collect fares from persons who get on at Charlestown. No one rides free. But the fares taken are not fares from Charlestown, but from stations to the north of it going south, and south of it going north."

Richmond Haseltine testified: "After getting upon the train, I stood upon the rear platform of a passenger car, being the same platform upon which Charles Manning stood, and after the train had stopped I saw the man lying on the track about five feet behind the front end of the next car. He was lying so that the farther car-wheel must have gone over his neck. I saw the truck go over him. I did not get on till after the train had stopped. I went into the same car where Eaton was. Perhaps a minute would cover the whole time of stopping there. Perhaps the train might not have been exactly stopped when I got on."

George A. Parker testified: "I got on the same train at Charlestown about opposite the post marked '500 feet.' As I was getting on, and had got up three steps, a man stepped off on the other side. The man stepped off just at the instant I got on. I did not know him, and only saw his back. The train was moving when I got on, and I should judge it was moving very slowly when the man stepped off. I should think it moved six or eight feet after he stepped off. I heard a cry, 'Some one run over, his head cut off,' just at the instant before our train started. The freight train passed just as I got to the top of the platform."

Upon this evidence, the judge ruled, at the request of the defendant, that the action could not be maintained; and directed the jury to return a verdict for the defendant.

If, upon the evidence, the action could be maintained, the verdict was to be set aside; otherwise, to stand.

*C. G. Fall*, for the plaintiff.

*S. Lincoln*, for the defendant.

W. ALLEN, J.   While there was evidence proper to submit to a jury of the negligence of the defendant, and of the gross negligence of its servants or agents, there was no evidence of the exercise of ordinary care by the deceased; and the ruling of the court, that the action could not be maintained, was correct, if the burden was upon the plaintiff to prove such care.   Whether such burden was upon the plaintiff depended upon whether the deceased was a passenger.   If he was a passenger, and his life was lost through the negligence of the defendant, or the gross negligence of its servants or agents, it would not be necessary to prove that he was not negligent.   Pub. Sts. *c.* 112, § 212.   *Commonwealth* v. *Boston & Lowell Railroad*, 134 Mass. 211.   *Merrill* v. *Eastern Railroad*, *ante*, 252.   If, therefore, there was evidence to be submitted to the jury that the deceased was a passenger when he was injured, the ruling was wrong.

The deceased was upon a regular passenger train from Boston, and the only ground for contending that he was not a passenger upon it was that he left it without surrendering his ticket or paying his fare.   He had a ticket, which gave him a right to ride as a passenger, and he had no opportunity to surrender it, or to pay his fare.   It cannot be assumed, as matter of law, that he was not riding upon the ticket which he held, or that he intended to evade the payment of his fare, or left the car for that purpose.

There was evidence tending to show that the deceased left the train after it had stopped at a station where passengers were accustomed, and had a right, to take and leave the cars.   If a passenger, he would continue to be such while rightfully leaving the train and station.

It is objected, that he had no right to leave the car in the manner in which he left it; and that, before he was injured, he had ceased to be a passenger by leaving the car negligently, and as he had no right to do.   But it does not appear that he did not so leave it in consequence of the negligence of the defendant.

The defendant had made provision only upon one side of the track for passengers to leave the cars, and it was dangerous to leave upon the other side. Upon the evidence, it was a question for the jury whether it was negligent in the defendant not to have provided some means to prevent passengers from leaving on the wrong side, or to notify them not to do so. If there was such negligence of the defendant, and, in consequence of it, the deceased, being a passenger upon the car, left it upon the wrong side, and thereby lost his life, we think he must be regarded as a "passenger" within the meaning of that word in the statute, although it did not appear that he was not negligent in so leaving the car. To this extent, we think that the ruling at the trial was wrong.                          *Verdict set aside.*